UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In Re: KMC REAL ESTATE INVESTORS, LLC, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| In Re: KENTUCKIANA MEDICAL CENTER, LLC, | ) | 4:13-cv-179-SEB-WGH |
| | ) | |
| Debtor – Consolidated Party re: 4:13-cv-181-SEB-WGH | ) | |
| | ) | |
| | ) | |
| ABDUL G. BURIDI, | ) | |
| | ) | |
| Appellant | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| KMC REAL ESTATE INVESTORS, LLC, KENTUCKIANA MEDICAL CENTER, LLC, Consolidated Party re 4:13-cv-181-SEB-WGH | ) | |
| | ) | |
| Appellee. | ) | |

**APPELLANT'S REPLY BRIEF**
**TO**
**BRIEF OF APPELLEE KMC REAL ESTATE INVESTORS, LLC**

Miles S. Apple
APPLE GARDINER CAMOMOT PLLC
6006 Brownsboro Park Boulevard
Suite E
Louisville, KY 40207
Telephone: (502) 882-1338
Facsimile: (502) 805-0546
Miles.apple@applegardiner.com
*Counsel for Appellant, Abdul G. Buridi*

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………………………..3

Reply……………………………………………………………………………………………4

    I.     Counterpoint to KMC Real Estate Investor, LLC's Statement
          Of the Facts…………………………………………………………………………4

    II.    It is the Offer that Violates Federal Healthcare Laws…………………………..6

    III.   The bankruptcy court did improperly delegate its judicial authority to
          RL BB and the plan does violate 1127(b)…………….…………………………11

    IV.   Substantive Consolidation…………………………………….…………………14

    V.    Absolute Priority………………………………………………………...…..15

    VI.   Feasibility of the Plan is Impacted by Existing and Continuing
          Healthcare Law Violations…..……………………………………………...16

Conclusion………………………………………………………………………………17

# TABLE OF AUTHORITIES

*Cases:*

*In re UNR Industries, Inc,* 173 B.R. 149, 157 (N.D. Ill. 1994)

*In re L & V Realty Corp.,* 76 B.R. 35, 37 (Bankr.E.D.N.Y.1987)

*In the Matter of United Merchants and Manufactures, Inc.,* 24 C.B.C. 220, 226–27 (Bankr.S.D.N.Y.1981)

*Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002)

*In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000)

*Envirodyne Indus., Inc. v. Viskase Corp.*, 183 B.R. 812, 818 (N.D.Ill. 1995)

*United States v. Greber*, 760 F.2d 68, 71 (3rd Cir.), cert. denied, 474 U.S. 988 (1985).

*United States ex rel. Minge v. Hawker Beechcraft*, 2014 U.S. Dist. LEXIS 42425 (S.D.N.Y. March 27, 2014).


*Authorities:*

      42 U.S.C. Section 1395nn

      42 U.S.C. Section 1395nn(a)(1)(B)

      42 U.S.C. § 1320a-7b (b)(2)

      11 U.S.C. section 1127

      42 U.S.C. §§ 1320a-7(a) and (b)

I.        **Counterpoint to KMC Real Estate Investor, LLC's Statement of the Facts**

In its Statement of the Case found in the Brief of Appellee, KMC Real Estate Investors, LLC (Appellee Brief, Docket #51), KMC Real Estate Investors, LLC (KMCREI or Appellee) again embraces the notable admission/referrals records of Drs. Stavens, Hallal, Campbell and LaRocca and again seeks to denigrate Dr. Buridi for his lack of admissions (pgs. 5-6. Appellee's Brief, Docket #51).  While admittedly, Dr. Buridi did not support the hospital with any admissions/referrals during the course of the bankruptcy, and continues to not send either to the hospital, Dr. Buridi did note in his Appellant's Brief his notable contributions through judgment liens, wage garnishments and other judgment enforcement actions, all arising from his guaranty of the debt of Kentuckiana Medical Center, LLC (KMC) and KMCREI.

The judgment lien and wage garnishment of RLBB against Dr. Buridi still remains on his real property and salary, respectively.  He also currently has charging orders by RLBB placed against his various business interests.  The referring doctors face no such calamities.

Dr. Buridi makes this known because that the Appellee says, quite frankly, Dr. Burdi did nothing to benefit the hospital or KMCREI.  This is frankly false.  Dr. Buridi served as a guarntor for both KMC and KMCREI on loans.  KMCREI ignores that fact and seems to imply that Dr. Buridi is not doing enough to help.  However, has it ever occurred to KMC or KMCREI that Dr. Buridi has an ethical and legal duty not to admit/refer patients?

A guaranty is a financial accommodation.  In this case, that financial accommodation has been provided to KMC and KMCREI.  The federal physician self-referral statute, the Stark Law, prohibits physician referrals of designated health services ("DHS") for Medicare and Medicaid patients if the physician (or an immediate family member) has a financial relationship with that entity.  42 U.S.C. Section 1395nn.

The Stark Law prohibits physician self-referral.  Physician self-referral is the practice of a physician referring a patient to a medical facility in which he or she has a financial interest, be it ownership, investment, or a structured compensation arrangement. Critics of the practice allege an inherent conflict of interest, given the physician's position to benefit from the referral. They suggest that such arrangements may encourage over-utilization of services, in turn driving up health care costs. In addition, they believe that it would create a captive referral system, which limits competition by other providers.

Given that the Stark Law can be interpreted broadly, would it make sense for Dr. Buridi to make any referrals to the hospital?  After all, Dr. Buridi had four judgments against him relating to KMC and KMCREI debt.  He obviously would have every incentive to refer all of his patients to the hospital so that KMC and KMCREI could pay off the underlying debt that supports those judgments.  He choose not to refer.  Violations of the Stark Law come with very harsh criminal and civil liability per transaction. Why would Dr. Buridi risk additional monetary exposure and criminal liability for this potential liability?

That potential liability is even more pronounced today now that both KMC and KMCREI are 100% owned by the Exit Investor, presumably a sister company or subsidiary company of creditor RLBB.  Simply stated, the owner of both KMC and KMCREI directly or indirectly also has a judgment lien on Buridi's home, charging orders on his business and a wage garnishment on his paycheck.  Any referral to KMC appears to be a huge conflict of interest and could generate huge potential criminal and civil liability for Buridi and the hospital.[1]  An owner of a hospital with judgments against thirty local area doctors seems to be exactly the kind of captive referral base the statute seeks to prevent.

---

[1] Under Section 1395nn(a)(1)(B), the entity that bills Medicare for the self-referral is liable for the amount billed to Medicare.

5

Stark does contain numerous exceptions (detailed in the remainder of the statute).  Dr. Buridi may fall into one of those exemptions. Just how KMC and ultimately the Exit Investor justify each referral of Medicare patients by Drs. Stavens, Hallal, Campbell and LaRocca is something to which Dr. Buridi is not privy.  Buridi may fall under the same exception.  But, the more prudent course for Dr. Buridi would be to follow the statute's prohibition against referrals by physicians with a financial interest in the hospital.  Buridi also wonders whether any patient would follow the referral if he is required to disclose that the owner of the hospital has a $400,000 judgment against him.

Therefore, Dr. Buridi disputes the Appellee's inference that Dr. Buridi should follow the example of other doctors and risk violating his legal and ethical duties by doing more for the KMC than he has already done.

II.     **It is the Offer that Violates Federal Healthcare Laws.**

Appellee's Third Amended Plan of Reorganization dated June 14, 2013 (Docket No. 354, Appellee's Plan) is the violation of the Anti-Kickback Statute.  In its Appellee's Brief, KMCREI continually (and coyly) makes the statement that equity may or may never be distributed to referring physicians. It assets the "right" to remain silent on this issue.  The failure to commit one way or another is a tacit admission that this is a problem.  Otherwise why not clear the air and simply assert the right to award equity?  While the distribution of equity raises concern for possible additional and future violations, it is the offer, not the payment where the Appellee should focus its attention.  Under 42 U.S.C. § 1320a-7b (b)(2)

> **(2)** Whoever knowingly and willfully *offers* or pays any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind to any person to induce such person—

6

>>> (**A**) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>>> (**B**) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>>>
>>> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(emphasis added)

KMCREI's Plan states:

>>> The remaining 20% of new membership interests in the Debtor shall include voting and distribution rights, and shall be issued to Dr. Christodulous Stavens, Dr. Eli Hallal, Dr. Jeffrey Campbell and Dr. Renato LaRocca in consideration of their ongoing commitment to the hospital and their importance to the feasibility of this Plan and the KMC Plan."
>>> *Appellee's Plan*, at Section 8.4.

In the Appellee's Plan, which is recognized in bankruptcy law to be contractual in nature, KMCREI explicitly *offered* to pay membership interests (*consideration*) to Drs. Stavens, Hallal, Campbell and LaRocca (*individuals providing a service for which may be made in whole or in part under a Federal health care program*).  The "hospital" is the Kentuckiana Medical Center, LLC (KMC), KMCREI's tenant and a reorganized debtor in a separate bankruptcy case. In essence, KMCREI offered payment to the top referrers of a hospital, which seeks reimbursement from Medicare and Medicaid.

It has also been established at the confirmation hearing, and in the Appellee's Brief, that Stavens, Hallal, Campbell and LaRocca account for 70-80% of the admissions to KMC (the hospital).  KMCREI attached the financial statements of KMC to Appellee's Disclosure Statement dated June 14, 2013 (Docket No. 355 and "Disclosure Statement").  Those financial statements purportedly support Appellee's Plan, but also reference numerous contracts with Medicare and Medicaid and healthcare plans.  Given that Stavens, Hallal, Campbell and

LaRocca account for 70-80% of all admissions to the hospital, it would be impossible for at least one of those admissions not to be reimbursed for services reimbursed by Medicare or Medicaid.[2]

The only remaining element is the intent.  However, there is ample evidence to support at least a motive based on the statements made at the Confirmation Hearing.  For example, KMC's counsel stated that "the new value that's being provided by these four docs to this hospital, these four docs provide 75 percent of the admissions to KMC which in fact is then going to pay rent to KMCREI so the building doesn't get foreclosed on."  Pages 26-27 of the Confirmation Hearing Transcript.  There are numerous other examples in the Confirmation Transcript; however, this quote pretty provides strong evidence of a motive to induce referrals.

Without looking at the complicity of the doctors themselves, has not KMCREI expressly and unapologetically offered remuneration to the four doctors to induce such doctors to continue to refer patients to the hospital in order for the hospital to pay its rent to KMCREI.

The confirmation process in a chapter 11 is basically a contract negotiation.  The debtor offers a plan (the offer) to creditors.  The creditors decide whether to accept the offer.  If the offer is accepted, it becomes a contract.  *In re UNR Industries, Inc,* 173 B.R. 149, 157 (N.D. Ill. 1994) (quoting *In re L & V Realty Corp.,* 76 B.R. 35, 37 (Bankr.E.D.N.Y.1987) (quoting *In the Matter of United Merchants and Manufactures, Inc.,* 24 C.B.C. 220, 226–27 (Bankr.S.D.N.Y.1981)).  The Seventh Circuit has explained that "[a] confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002). The provisions of a confirmed plan bind the debtor and creditors in the same

---

[2] This conduct may also impact claims for reimbursement under there KMC's various private healthcare insurance contracts as well.

manner as a contract. *See In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000); *Envirodyne Indus.,*

*Inc. v. Viskase Corp.*, 183 B.R. 812, 818 (N.D.Ill. 1995).

      Buridi, by objecting to the Appellee's plan, rejected the offer.  He believed that the

Appellee's Plan violated federal healthcare laws.  He brought his objections to the attention of

the bankruptcy court.  The bankruptcy court expressed concern, and tried to address the illegality

through a last minute addition to the Appellee's Plan, but approved the Appellee's Plan over the

objections.  The bankruptcy court offered this language, as proposed by RLBB, to resolve

Buridi's concerns:

> Notwithstanding anything in the KMCREI Plan or KMC Plan to the contrary, and
> for the purposes of clarification and to resolve the Rule 9023 Motion, the Plans
> shall be deemed construed and deemed amended, as necessary, to provide as
> follows: (a) implementation of the Plans and all transactions necessary to
> consummate the Plans including, without limitation, distributions of equity or
> other property to doctors that provide services and/or referrals to the KMC
> hospital, shall comply with all applicable health acre laws and regulations
> including, without limitation, the anti-kickback and so-called "Stark Laws" found
> in Title 42 of the U.S. Code (the "Applicable Healthcare laws"); (b) Section 8.4 of
> the KMCREI Plan and Section 9.04 of the KMC Plan are amended to add, as a
> condition precedent to the Effective Date, that the Exit Investor is satisfied that
> implementation of the Plans will comply with Applicable Health Care Laws; and
> (c) in the event that the proposed distributions to Drs. Stavens, Hallal, Campbell
> and/or LaRocca, or the proposed treatment of the administrative claims held by
> such doctors, is determined by the Exit Investors to violate or risk violating the
> Applicable Health Care Laws, the distribution and/or treatment of such claims
> shall be modified or eliminated to the extent necessary to ensure full compliance
> with the Applicable Health Care Laws.
> Amended Confirmation Order, pgs. 6-7

RLBB's suggested language, which was added by the bankruptcy court to the Confirmation

Order, supposedly to resolve Buridi's Motion to Reconsider, does not resolve the violation.

While RLBB's language seems to allow auto-amendment of the Appellee's Plan, how can the

Exit Investor take back an offer once it has been made and accepted?  Whether these equity

distributions are now being justified as payment for administrative claims of KMC, or as

purportedly valid under a service contracts with KMC is now irrelevant.  This is merely an attempt to cover up the violation which has already occurred.

Now, though, the Exit Investor appears complicate in the violation.  It states: "Section 8.4 of the KMCREI Plan and Section 9.04 of the KMC Plan are amended to add, as a condition precedent to the Effective Date, that the Exit Investor is satisfied that implementation of the Plans will comply with Applicable Health Care Laws."  In other words, the Exit Investor is not supposed to fund the Appellee's Plan unless the Exit Investor is satisfied that the KMC Plan and the KMCREI Plan will comply with applicable healthcare laws.  Yet the Exit Investor continues to take no position in this Court on whether or not the course of action set forth in the Appellee's Plan is or is not legal.

The Exit Investor has declared the Effective Date.  Thus, the Exit Investor must have been satisfied that the Appellee's Plan complies with all applicable healthcare laws, even the explicit offer of equity for certain doctors' "ongoing commitment (i.e. referrals).  This Court has also held that the Plan as confirmed is substantially consummated.  (Order Denying Motion to Dismiss, pg. 8, Docket #39).  However, the Exit Investor apparently has not decided to whether to actually *pay* the equity (a separate violation), as it continues to hedge its bets on whether paying the equity violates federal healthcare laws.[3]

First, apparently, the Exit Investor has amended the Appellee's Plan, presumably under this auto-amendment power granted by the bankruptcy court.  On the face of the Appelle's Plan, the equity would have been automatically awarded upon the Effective Date.  Now, apparently paying that equity is a discretionary decision of the Exit Investor, which may or may not occur.

---

[3] For the record, the Appellee offers no evidence or proof that the equity has not been paid.

Second, by prolonging this decision, is not the equity investor only compounding the "offer"?  With the language awarding the equity still in the Appellee's Plan, dangling out there as a teaser, is it not reasonable to assume that the referring doctors still believe that they will one day receive equity?  Is it not reasonable to assume that this documented possibility of future compensation creates a continuing incentive to make referrals?  If that is the case, then the Exit Investor is violating the statute.  By delaying the decision, the Exit Investor perpetuates referrals from those doctors.  Thus, Buridi is not asking for an advisory opinion.  These issues are real and ripe for a decision.

The coyness of the Appellee's Brief is disrespectful to Buridi and this Court.  In essence, the Appellee is saying that the Exit Investor has the right either to award equity, or not to award equity, and the Exit Investor has not yet decided what to do.  That is a very convenient position for the Appellee to take.  It keep its cards under its vest and, after the appeal is denied, the Appellee can start the process of breaking federal law.  This begs the rhetorical question: Is their inaction a tacit concession they were poised to break federal law before the flagrant violations were brought to their attention by Buridi?

III.   **The bankruptcy court did improperly delegate its judicial authority to RL BB and the plan does violate 1127(b)**

First, Appellee's "invited error" argument is absurd.  It is pure sleight of hand. Buridi did not ask for the "no violations of law" language adopted by the Court.  He simply asked for the Appellee's Plan not be confirmed.  That language was not error injected by Buridi, it was error injected by RLBB in response to Buridi's Motion to Reconsider.  The bankruptcy court apparently accepted RLBB's language as a convenient resolution of Buridi's Motion.  Buridi never asked for the Court to amend the Confirmation Order.

11

Second, as explained in the previous section, a justiciable case or controversy arises by the mere fact that the Plan itself, the offer of equity for referrals, has been made and accepted?

The Appellee states that "Dr. Buridi seems to believe that the bankruptcy court had a duty to monitor the plan post-confirmation, and '[t]o punt the determination as to whether [KMCREI] violates federal healthcare law in its Plan is impermissible.'" Appellee's Brief, pg. 14 (citing Appellant's Brief, at 24).   This is exactly what Dr. Buridi expected.

First, the Appellee's Plan say the Court retains jurisdiction to "consider any modification of the under Section 1127 of the Bankruptcy Code and/or modification of the Plan after substantial consummation thereof."  (Article XI (l), pg. 10 of the Appellee's Plan).  Is the Appellee suggesting that modification of the Appellee's Plan is no longer under the jurisdiction of the bankruptcy court because it involves a plan's violation of federal healthcare laws?

Second, the Appellee's Plan states explicitly that 80% of the Appellee's equity is to be held by the Exit Investor and "[t]he remaining 20% of new membership interests in the Debtor … shall be issued to Dr Christodulous Stavens, Dr. Eli Hallal, Dr. Jefferey Campbell, and Dr. Renato LaRocca in consideration of their ongoing commitment to the hospital and importance to the feasibility of the Plan and the KMC Plan."  This equity distribution supposedly occurs on the Effective Date.  Although no record has ever been provided by the Appellee nor RLBB, the Exit Investor supposedly still owns 100% of the equity of the Appellee and may or may not distribute this equity in the future.  Also, instead of this award coming from the mechanics of the Appellee's Plan, it is now a discretionary award of the Equity Investor.  In other words the Exit Investor has supposedly already amended the Appellee's Plan without any bankruptcy court disclosure or notice to creditors or, more importantly, the four doctors.

As stated above, the provisions of a confirmed plan bind the debtor and creditors in the same manner as a contract. *See In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000); *Envirodyne Indus., Inc. v. Viskase Corp.*, 183 B.R. 812, 818 (N.D.Ill. 1995)

What happens if Drs. Stavens, Hallal, Campbell and LaRocca petition the bankruptcy court for the equity award promised by the Appellee's Plan in consideration for their "ongoing commitment to the hospital and importance to the feasibility of the Plan and the KMC Plan"? Under the "Compliance with Applicable Non-Bankruptcy Laws" provision, the bankruptcy court effectively states that is a decision the doctors have to take up with the Exit Investor. The bankruptcy court ceded its interpretation of the Appellee's Plan, as well as the rights of those doctors to the Exit Investor. Does that mean the doctors could go to the Exit Investor and concoct a scheme to pay another kickback to them without any need to disclose this to other creditors.

Buridi understands that his arguments involve some speculation, but no other course is possible given the "hide the ball" approach taken by the Appellee. Much ado is made by the Appellee that the equity distribution may or may never occur. Buridi is more bothered by implication that the Appellee's Plan may or may never occur as written. Under the bankruptcy court's auto-amendment provision, the bankruptcy court, this Court, Buridi, other creditors and the doctors may never know what the Appellee's Plan truly is because the bankruptcy court gives the Exit Investor to amend and construe what the Appellee's Plan says.

Does this mean that the offer of equity in the Appellee's Plan (the violation of the Anti-Kickback Law) is construed as not really an offer because such an offer would violate federal healthcare laws? Does that mean that in construing the plan, a court must ignore the statements of KMC's counsel and KMC's Chief Restructuring Officer as to the reason for the equity

distribution to support the Appellee's Plan.   If this is what the bankruptcy court meant to do in its order, would that not abrogate the right of some enterprising United States government to enforce the health care laws?  It is very convenient to take the position that once the sin is committed, it can be white-washed by an the owner of a hospital and real estate holding company by saying they will make sure that the Appellee's Plan complies with federal healthcare law while never disclosing how.  Never mind that an explicit offer was made in a confirmed plan and record evidence pointed to the fact that this was a blatant violation of federal health care law.

IV.   **Substantive Consolidation**

Buridi still believes firmly in the integrity of separate bankruptcy estates.  He firmly believes that a one debtor cannot award insiders for another "companion" case.  He also believes that this setup was invented for a purpose.  If one looks at the Stark Law found in 42 U.S.C. § 1395nn, the award of equity is not being given to Drs. Stavens, Hallal, Campbell and LaRocca in KMC despite their continuing referrals to the hospital, for a good reason.  The award of KMC's equity to these doctors would clearly trigger ownership rules, meaning no future referral by the doctors. This would mean that the hospital would lose 70%-80% of its referrals, and the hospital "would die."  Having a closely associated case allows that problem to be obscured if not avoided.  In plain terms, the apparent purpose of this setup is to allow KMCREI to award equity to the four doctors while allowing KMC to still receive the benefit of the doctor's referrals.

If the Court did substantially consummate the two estates, the "no referrals" prohibition would kick in and the hospital would be without 70% - 80% of its referrals.  It is obvious why the Appellee maintains there was no effective substantive consolidation, to do so would prevent the hospital from receiving the benefit of the referrals.  The Appellee is merely a shell company, majority owned by the same Exit Investor as the hospital.  If it is not the alter ego of KMC, it is

14

certainly acting in concert with KMC and as its instrumentality.  There is no reason why it should be independent of the KMC, except to pay a kickback to the doctors and not trigger the Stark Law.

V.    **Absolute Priority**

The Appellee is absolutely right in explaining the absolute priority analysis.  Buridi, Stavens, Hallal, Campbell, La Rocca and numerous other doctors and entities were all equity interest holders in the Appellee.   The Appellee's Plan cancelled those equity interests.  The Appellee's Plan then awards new equity to Stavens, Hallal, Campbell and LaRocca, in part, for their ongoing contribution to the KMCREI Plan.

This is a bankruptcy strategy known as a "reverse cramdown".  While numerous creditors have objected to the strategy based on absolute priority, the majority of courts have upheld such awards, saying it is really a gift by the new owner to those insiders who helped in the reorganization.

Without going into the long line of cases supporting a "reverse cramdown," the simple question is why did the existing membership interests of Appellee have to be cancelled.  If the Appellee had so much excess equity that they could award equity to the four doctors for their contributions to KMC, why were the existing claims cancelled and anything awarded to satisfy claims of another estate?  Is this not a junior class of creditors?  It is not even a class of creditors of the Appellee.

It is irrelevant whether the equity distribution was rewarded for referrals to KMC, administrative claims of KMC or whatever.  They are claims of KMC, not KMCREI.  Appellee

had the obligation to satisfy its existing creditor and equity membership base first before it

started awarding equity membership interests to support separate estates.

However, if this is truly a "gift" by the new owner of the hospital, much like other

Courts have justified the apparent violation of absolute priority in reverse cramdown, this

implicates RLBB in violation of the Anti-Kickback Statute?  As KMC's counsel stated at the

Confirmation Hearing:

> And as a practical matter Rialto is going to end up with 100 percent
> ownership and ultimately transfer 20 percent of their ownership interest to
> these four doctors. All this amendment was doing is saying, look, we're
> trying to have full disclosure here, we're not trying to play hide the ball.
> That ultimately the end result is 80 percent Rialto, 20 percent the docs.

Confirmation Hearing Transcript, pg. 26, lines 15-21

If the offer really came from RLBB, then RLBB violated federal healthcare laws, using the

Appellee as its chosen vehicle of conveyance.


VI.   **Feasibility of the Plan is Impacted by Existing and Continuing Healthcare Law
      Violations**

Buridi has shown that the Appellee's Plan itself constitutes the offer, the solicitation of

referrals for equity.  As pointed out in his Opening Brief, it is immaterial whether remuneration

actually induces someone in a position to refer or recommend.  It is sufficient that the

remuneration may induce one to refer or recommend. *United States v. Greber*, 760 F.2d 68, 71

(3rd Cir.), cert. denied, 474 U.S. 988 (1985). Under *Greber*, it is also irrelevant that there are

other legitimate reasons for the remuneration. If one purpose is to induce referrals, then the Anti-

Kickback Statute is violated. *Id.* at 71.

16

The sanctions for violating the Anti-Kickback Statute are criminal and civil fines and penalties, including exclusion from the Medicare and Medicaid programs. *See generally*, 42 U.S.C. §§ 1320a-7(a) and (b). Enforcement actions usually are brought by the Office of the Inspector General of the Department of Health and Human Services. The government may also assess civil money penalties, which could result in treble damages plus $50,000 for each violation of the Anti-Kickback Statute. 42 U.S.C § 1320a-7a(a)(7).

Additionally, courts have held that Anti-Kickback claims are non-dischargeable in bankruptcy. See *United States ex rel. Minge v. Hawker Beechcraft*, 2014 U.S. Dist. LEXIS 42425 (S.D.N.Y. March 27, 2014)

Does it make sense for the Appellee to ignore the violation and not correct it publically, compounding the violation? Or, should the Appellee ultimately address the violation, correct it and lessen the damages from the violation?

## CONCLUSION

For the foregoing reasons, this Court should reverse the bankruptcy court's Amended Confirmation Order and require the debtor to file an amended plan removing those portions of the Appellee's Plan and Amended Confirmation Order complained of herein.

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2014, a true and correct copy of the foregoing was mailed electronically through the U.S. District Court's ECF System at the electronic addresses as set forth in the ECF System, to the Appellee's Counsel, and all other persons receiving electronic notifications in this case.

| | |
|---|---|
| Counsel for KMCREI: | David R. Krebs<br>Courtney Chilcote<br>Bradley J. Buchheit<br>TUCKER HESTER BAKER & KREBS, LLC<br>One Indiana Square, Suite 1600<br>Indianapolis, Indiana  46204<br>Telephone: (317) 833-3030<br>Facsimile:  (317) 833-3031<br>dkrebs@thbklaw.com<br>cchilcote@thbklaw.com<br>bbuchheit@thbklaw.com |
| Counsel for KMC: | David M. Cantor<br>Neil C. Bordy<br>Tyler R. Yeager<br>SEILLER WATERMAN LLC<br>Meidinger Tower, 22nd Floor<br>462 South 4th Street<br>Louisville, KY  40202<br>Telephone: (502) 584-7400<br>Facsimile: (502) 583-2100<br>cantor@derbycitylaw.com<br>bordy@derbycitylaw.com |

and hereby further certify that on December 1, 2014, a true and correct copy of the foregoing was mailed via first class U.S. Mail to the U.S. Trustee's Counsel.

| | |
|---|---|
| Counsel for U.S. Trustee: | Laura A. DuVall<br>Office of the U.S. Trustee<br>101 West Ohio Street, Suite 1000<br>Indianapolis, Indiana  46204<br>Telephone: (317) 226-6101<br>Facsimile:  (317) 226-6356<br>Laura.DuVall@usdoj.gov |

/s/ Miles S. Apple_____

Miles S. Apple, *Counsel for Appellant, Abdul G. Buridi*

18